GROENDYKE TRANSPORT CO., Inc., et al. v. DYE et ux.

No. 6306.

Court of Civil Appeals of Texas. Amarillo.

May 25, 1953.

Rehearing Denied June 29, 1953.

Underwood, Wilson, Sutton, Heare & Boyce, Amarillo, for appellants.

F. H. Richards, Dalhart, for appellees.

PITTS, Chief Justice.

This is an appeal from a judgment awarding damages by reason of a collision between two motor vehicles upon a public highway which resulted in the death of two minor children and property damages. Appellees, J. C. Dye and wife, Fern Dye, sued appellants, Groendyke Transport Company, a corporation, and its employee, Everett Stallings, for damages sustained by them by reason of Stallings' alleged negligence in the operation of a large gasoline transport truck owned by Groendyke Transport Company when it collided with a 1949 Frazer automobile owned by appellees and killed the driver thereof, Chester Dye, the 17 year old son of J. C. Dye by a former marriage, and a passenger therein, Rogene Jones, the 15 year old daughter of Fern Dye by a former marriage, and likewise caused property damages as alleged. The natural mother of Chester Dye was deceased as was the natural father of Rogene Jones. J. C. Dye had four children by his former marriage, two boys, namely, Chester and Phillip, and two daughters both of whom were married at the time of the collision, while Mrs. Fern Dye had none other than Rogene by her first marriage. However, Mr. and Mrs. Dye married in 1937, thus uniting their children in the same family when the ones here involved were very small, and they had three other children born to this marriage.

The Dye family resided in Dalhart, Texas, but J. C. Dye owned and operated an automobile agency in Dumas, Texas. On November 2, 1951, Chester and Phillip went with the Dalhart football squad to Shamrock for a game. Later in the day Mrs. Dye took her daughter Rogene and two neighbor children, Helen Freeman and Bowdry Bloxom, in her car, drove by Dumas where Mr. Dye was on duty, picked him up at Dumas and all drove to Shamrock for the ball game. After the game Chester and Phillip joined the family and the two neighbor children for the return trip home, all riding in the Dye family car until they reached Dumas. There Chester, Rogene and the two neighbor children, Helen Freeman and Bowdry Bloxom, left the Dye family car to pick up the business car of J. C. Dye in Dumas, which car he used to drive back and forth between his home in Dalhart and his place of business in Dumas. With Chester Dye operating the latter car occupied by himself, Rogene and the two neighbor children, with two of them riding in the front seat and two riding in the back seat, they left Dumas following Mr. and Mrs. Dye and Phillip in the family car for the remainder of the trip to their homes in Dalhart. J. C. Dye drove faster than his son Chester did and therefore he with his wife and Phillip drove away from Chester and the other children and had returned home before he heard about the collision. While on the return trip home the Frazer automobile had a collision with the gasoline transport truck owned by Groendyke Transport Company and being operated by Everett Stallings at about 2:50 a. m. o'clock on November 3, 1951, approximately 1.8 miles south of the city limits of Dalhart in Hartley County, Texas, while both motor vehicles were travelling on U. S. Highway No. 87, which collision resulted in the death of all four of the occupants of the Dye car and injuries to Everett Stallings which caused him to be temporarily unconscious. Stallings was taken immediately to the Loretto Hospital at Dalhart where he remained for several days.

The case was tried to a jury which found in answer to special issues that immediately prior to the collision Stallings drove his motor vehicle with a part of it across the center line of the highway and upon Chester Dye's side of the same and that such constituted negligence which was a proximate cause of the collision. The jury likewise found that Stallings failed to maintain that character of lookout for approaching vehicles which a person of ordinary prudence would have maintained under the same or similar circumstances at the time and place of the collision and that such failure was a proximate cause of the collision. The jury also found that Chester Dye found himself in a position of sudden

peril and alarm immediately prior to the collision, caused by Stallings driving the gasoline transport truck across the center line of the highway with a part thereof on Chester Dye's side of the highway and that such sudden peril and alarm caused Chester Dye to drive his motor vehicle onto his left-hand lane of the highway, which was a reasonable thing for him to do from his standpoint at the time because of his apprehension of sudden peril and alarm and because the appearance of danger was so imminent to him as to leave him no time for deliberation. The jury further found that the act of Chester Dye in driving his motor vehicle with part of it across the center line of the highway and onto Stallings' side of the highway did not contribute to or cause the perilous situation he found himself in. The jury also found that immediately prior to the time Chester Dye turned his motor vehicle toward his left lane of the highway his mind was in a startled, dazed and confused condition but that his act of driving his motor vehicle to his left with part of it across the center line of the highway and on Stallings' side thereof did not cause or contribute to cause the startled, dazed or confused condition of mind. The jury likewise found that the collision was not the result of an unavoidable accident. It also found that the rate of speed Chester Dye was driving immediately prior to the collision was not a proximate cause of the collision. The jury further found that the fact that Chester Dye, immediately prior to the collision, drove his motor vehicle with a part thereof across the center line of the highway and upon Stallings' side of the highway was a proximate cause of the collision. However, the jury did not find that such an act on the part of Dye was negligence and no such issue was requested or submitted to the jury inquiring if such act of Dye constituted negligence. The jury further found that immediately before the collision Chester Dye failed to maintain that character of lookout for approaching vehicles which a person of ordinary prudence would have maintained under the same or similar circumstances and that such failure was a proximate cause of the collision.

Appellants filed a motion for judgment upon the verdict of the jury and the same was overruled. Thereafter appellants filed a supplemental motion for judgment requesting the setting aside and disregarding of all of the answers of the jury to special issues concerning sudden peril and alarm as well as the cause of the same, and appellees likewise filed a motion seeking to have set aside and disregarded the jury's answers to the special issue concerning Chester Dye's failure to keep a proper lookout at the time and place of the collision as well as the issue concerning proximate cause on the grounds that there was no evidence to support such issues and they sought to have judgment rendered for them on the remainder of the jury findings. After due notice both of these motions were heard by the trial court with a result that appellants' supplemental motion to have certain answers of the jury set aside and for judgment was overruled and appellees' motion was by the trial court sustained and granted, thus setting aside and disregarding the findings of the jury concerning Chester Dye's failure to keep a proper lookout at the time and place of the collision for the reason that there was no evidence to raise such issues. At the request of appellees the trial court likewise found that the action and conduct of Chester Dye in driving his motor vehicle with a part of it across the center line of the highway and upon Stallings' side thereof immediately before the collision was justified and did not constitute negligence on the part of Chester Dye. The trial court then rendered judgment against appellants, jointly and severally, and for appellees upon the remainder of the jury findings and upon stipulations of the parties as to funeral expenses awarding (1) to appellees jointly the sum of $3,320, consisting of $935 for the funeral expenses of Chester Dye, $835 for the funeral expenses of Rogene Jones, and $1,550 as damages done to the Frazer automobile; (2) to J. C. Dye as his separate property the total sum of $12,089.50, consisting of the sum of $4,902 for the probable loss of the pecuniary benefits and services of Chester Dye prior to his attaining the age of 21 years and the sum of $7,187.50 for the probable

loss of pecuniary benefits he would have received from Chester Dye after he attained his majority; and (3) to Mrs. Fern Dye as her separate property the total sum of $8,600 consisting of the sum of $3,600 for the probable loss of the pecuniary benefits and services of Rogene Jones prior to her attaining the age of majority and the sum of $5,000 for the probable loss of pecuniary benefits she would have received from Rogene Jones after she attained her majority. From such judgment appellants have perfected an appeal and have attacked the judgment upon 15 assignments or points of error presented. However, appellants have not challenged the findings of the jury which convicted Stallings of the acts of negligence that proximately caused the collision by reason of his failure to keep a proper lookout and his operating his truck across the center line of the highway and upon the wrong side of the same.

Appellants have attacked the sufficiency of appellees' pleadings and the evidence and have charged in particular that they do not support the issues of imminent peril. The jury found Chester Dye in a position of sudden peril and alarm caused by Stallings driving his vehicle across the center line of the highway and upon Chester Dye's right-hand side of the same and it exonerated Chester Dye from any blame or fault for the perilous situation of alarm. The jury likewise found, in effect, that the appearance of danger was so imminent to Chester Dye that his mind was startled, dazed and confused to such an extent that he quickly turned his vehicle to his left with part of it across the center line of the highway and upon Stallings' right-hand side of the same, which was a reasonable thing for him to do under the existing conditions and from his own point of view. The effect of these findings places all of the blame upon Stallings for Chester Dye's position of sudden peril and alarm and justify Chester Dye in turning his vehicle to his left across the center line of the highway in order to try to prevent a collision between his vehicle and the Stallings vehicle which was closely approaching Dye and on his side of the highway.

Appellees pleaded the time, place, occupants of the vehicle and other essential matters on the occasion in question and further alleged, in effect, that Chester Dye was driving on his own right-hand side of the highway in a northerly direction, entering a long gradual curve in the highway turning from a northeasterly direction toward a northerly direction and had just come to the crest of a hill, when he observed the truck in question approaching him from the opposite direction travelling on Dye's right-hand side of the highway and on the truck operator's left-hand side of the highway. But as Dye approached the crest of the hill he could not determine where on the highway the truck was being operated until he reached the crest of the hill. Upon observing the approaching truck on Dye's side of the highway, he (Dye) attempted to turn his motor vehicle to his own left-hand side of the highway to avoid a collision with the truck. When the vehicles drew near each other, approximately 40 feet apart, the operator of the truck turned his truck back toward his own right-hand side of the highway when the truck collided with the Dye automobile near the center of the highway causing the deaths and the alleged damages. Appellees also pleaded the existence of heavy highway marker posts in the ground 4 feet from the edge of the pavement along the highway curve on Chester Dye's right-hand side of the highway.

The foregoing pleading alleging the procedure of the Chester Dye vehicle travelling on his own side of the highway, following a long gradual curve toward the crest of a hill where he was confronted with an approaching truck on the wrong side of the highway and travelling in the same lane with Chester Dye but in the opposite direction, both vehicles moving in such a manner that Chester Dye could not avoid a collision, constituted sufficient pleadings to raise the issue of sudden peril and alarm, imminent danger and the elements composing the same, as well as Chester Dye's attempt to escape his perilous situation by avoiding a collision. We think the facts are sufficiently pleaded without actually pleading the doctrine of imminent

or sudden peril by name as appellants seem to contend.

We shall now examine the evidence to determine if it is sufficient. Both parties restate and analyze much of the evidence at length in their respective briefs, and we find little difference in their analysis given. Mrs. Henry Rhoades, a photographer with 20 years experience as such, was first called as a witness. She identified certain pictures she took of various scenes of the collision between 4:00 and 4:30 o'clock on the morning of November 3, 1951, the date of the collision. She further testified that she was called back to the scene by Highway Patrolman R. C. Johnson and made more pictures of the vehicles involved in the collision under his direction between 9:00 and 11:00 o'clock the same morning. Further reference will be later herein made to the photographs.

Roger W. Sosebee next testified after identifying himself as a State Highway Patrolman with four years experience as such who was then stationed at Dalhart. On the morning of the collision, which occurred about 2:50 a. m. o'clock, he and Highway Patrolman R. C. Johnson were called and went to the scene of the collision about 3:15 a. m. o'clock where they observed the existing conditions as related by him as a witness. He likewise testified that he made a record of all facts found and made a full report thereof. At the place of the collision they found two bodies lying on the highway and wreckage scattered about with two other bodies having already been removed by an ambulance, which soon returned for the remaining bodies. There was a damaged transport gasoline truck off on the east side of the pavement and a damaged 1949 Frazer automobile on the east side of the highway. The paved portion of the highway was black top asphalt which was 21 feet wide with a center stripe in the middle thereof and gravel or caliche shoulders on each side. The truck had been travelling south and the automobile had been travelling north on U. S. Highway No. 87. There was a curve in the highway of approximately 30° and a hill within the curve. The point of impact of the two vehicles was approximately 100 feet north of the crest of the hill. Along the east side of the pavement and around the curve there were highway marker posts placed about 8 feet from the edge of the pavement and about 123 feet apart and there was also a mail box between two of the posts. There were no obstructions along the west shoulder of the highway. The weather was clear and cold. The truck was an International truck tractor connected to a semi-trailer, which had double dual wheels on the back. The tractor had dual wheels on the back and single tires on the front. The trailer was connected to the tractor with what is called a "fifth wheel" or a pin that sits on the back of the tractor. The truck was about 12 feet long and the trailer measured 33.7 feet long, making them both about 45 feet in length. There were visible skid marks on the pavement showing the paths of the two motor vehicles just prior to the collision. There were heavy black skid marks on the pavement made by the dual wheels of the truck showing it had been travelling astraddle of the center stripe of the highway and the skid marks got heavier as they approached the point of impact. The skid marks of the left dual wheel extended about 4 feet over the center stripe into the truck operator's left-hand side of the highway, while the right-hand skid mark was about 2 feet west of the center line in the truck operator's right-hand lane. There was a fresh hole gouged out in the pavement about 8 inches in diameter and about one foot west of the center stripe. The hole marked the point of impact and the marks or tracks made by the truck led from the gouged out hole in the pavement north for a distance of 40 feet, showing the truck had travelled astraddle of the center stripe of the highway for the whole distance with the mark of the left-hand side of the truck 4 feet over on the east side of the center stripe and the mark of the right-hand side of the truck 2 feet west of the center stripe. The tracks or marks were about 6 feet apart and the width of the truck was about 6 feet. Both of the tracks or marks made by the truck were straight except that they followed the curve in the highway and were parallel to the center stripe in the highway for the full

distance of 40 feet. These marks were traceable from the beginning point 40 feet north of the gouged out hole in the pavement up to and under the wheels of the truck where it stopped. There was also a mark made by the right front wheel of the tractor or truck. It began about one foot west of the hole in the pavement, which hole was one foot west of the center stripe, and was traced to the right front wheel of the truck or tractor where it stopped.

Sosebee further testified concerning the skid marks made by the Frazer automobile which was travelling north and had just passed over the crest of the hill, which was about 100 feet south of the gouged out hole in the pavement. The car likewise left skid marks on the pavement just prior to the point of impact. The right-hand skid marks of the car began about 28 feet south of the hole in the pavement and also 3 or 4 feet west of the east edge of the pavement and continued straight to the point of impact at the said hole, while the skid mark made by the left wheels of the car began 39 feet south of the said hole in the pavement and also 2 or 3 feet east of the center stripe and continued straight to the point of impact at the said hole in the pavement. The skid marks showed the car turning to the left however immediately before the impact. The car was still on its side of the highway 20 or 30 feet from the point of impact but according to the skid marks its left-hand wheel crossed over the center line of the highway 10 or 12 feet from the point of impact, so that a part of the car was over the center line and on its left-hand side of the highway at the point of collision. From Sosebee's testimony it appears from the skid marks that the truck was over some 4 feet on the wrong side of the highway for a distance of at least 40 feet before the collision but immediately before the collision it began to turn back to its right, while the car was continuously on its side of the highway for a distance of at least 39 feet before the collision until its left-hand front wheel crossed over the center stripe 10 or 12 feet from the point of impact. The left front of the tractor or truck bore the main brunt of the damage by reason of the collision while the automobile was practically demolished.

This witness was also present when the photographer took the pictures, which he examined as a witness and pointed out thereon some of the skid marks shown on the pavement and particularly the dual wheel marks of the truck and trailer on the east side of the center line of the highway or on the wrong side of the same. Some of the pictures show the hole in the highway, the curve in question and some of the post markers along the east side thereof.

Highway Patrolman R. C. Johnson, Sosebee's official associate, testified at length concerning the physical facts at the scene of the collision and his testimony was substantially the same as that given by the witness Sosebee except for minor variations. Particularly did his testimony corroborate that given by Sosebee as to the location of skid marks showing the truck on its wrong side of the highway and the Frazer automobile on its proper side of the highway until the left-hand skid mark crossed the center line of the highway "about 10 feet" from the point of impact but the right-hand mark never did cross the center line of the highway. He also testified that the Frazer automobile had just passed the crest of the hill, which was a small hill with a gradual slope on each side thereof.

Between 5:00 and 5:30 a. m. o'clock on the morning of the collision the two highway Patrolmen visited appellant, Everett Stallings, at the Loretto Hospital in Dalhart and found him complaining of an injured leg or ankle but he was able to talk and give an account of his previous run for a couple of days. His statements made to the Patrolmen were limited as evidence, however, by the trial court to the cause of action pending against him. Both of the Patrolmen testified in substance that Stallings told them that he left Amarillo on Thursday morning before the collision the following Saturday morning, drove to Shamrock and then to Dumas where he spent the night in his truck. He left Dumas next morning about 9:00 o'clock, drove to the Sheerin Plant where he picked up a

load of gasoline and fuel and took it to Las Vegas, New Mexico, unloaded and returned to Springer, New Mexico, where he stopped for a while. Then he drove to Texline where he ate and then drove to the place of the collision. According to the testimony of the Patrolmen, Stallings further stated to them that soon after he left Dalhart travelling on Highway 87 and while approaching a curve in the highway he saw a car coming but could not determine which side of the highway it was on. He dimmed his lights two or three times but the car did not respond. He threw his lights on bright and it looked like the car was on his side of the highway and he then pulled up into the left-hand lane or at least up in the center of the highway, thinking he could miss the approaching car. But as he came around the curve he saw they were going to collide and he turned back to his right to avoid the collision but it occurred anyway. According to the Patrolmen, Stallings said he was in the center of the highway when the collision occurred. The two Patrolmen talked with Stallings again later in the afternoon on the same day when he told them that he had told the truth the first time but he again related to them the same account in substance of the collision. Such account twice given to the highway Patrolmen, in so far as it goes, does not seem to materially contradict in any manner the physical facts found on the grounds as related by both Patrolmen. On the contrary, the account as related by the Patrolmen corroborates in the main the existing physical facts found by them to exist on the pavement in so far as Stallings' account given to them related.

Elmer Burnett, a Dalhart Deputy Sheriff, was called as a witness and testified he visited the place of the collision between 8:00 and 8:30 o'clock on the morning of the collision and made notes of the physical facts there found. He found the road blocked off and traffic kept off of the highway where the collision occurred. He gave about the same account in substance of the existing physical facts as did the two Patrolmen.

The facts in this case in so far as they apply to venue were before this court in a venue action that arose out of the same general facts here presented. That case is styled Groendyke Transport Co., Inc., v. Freeman, et ux., the parents of Helen Freeman, who was one of the four children killed in the collision. The said case is reported in Tex.Civ.App., 255 S.W.2d 393. We there held that the testimony of Highway Patrolman Sosebee, supported by the pictures of the tracks of the vehicles (the pictures being the same ones presented here) reveals that the truck was driven around a curve in the highway, over the center line of the highway, while meeting the approaching vehicle driven by Chester Dye, in which the child Helen Freeman was riding at the time of the collision, and that such acts of the truck driver (Stallings) constituted negligence which proximately caused the collision in Hartley County, Texas, that resulted in the death of the said child, for which reason an active trespass was shown and venue should be maintained in Hartley County. No motion was filed for a rehearing in this court in that venue action.

A plea of privilege was also filed by appellants in this action, secking to have the main case transferred to Potter County. The same was duly heard and overruled by the trial court, from which order an appeal was perfected to this court, but the appeal has since been dismissed by this court upon a motion presented by appellants herein.

Appellant Everett Stallings testified in this case concerning his employment by Groendyke Transport Company and that he was still employed by the said company as a truck driver. He also testified, in effect, that on the occasion of the collision soon after he left Dalhart he was driving 30 or 40 miles per hour with his truck empty; that he had been over that highway many times and knew about the curve in the highway and the hill there; that as he approached the scene of the collision he first saw the reflection of the approaching car lights over the hill but could not see the car or its lights until it "topped the hill"; that he dimmed his lights several times and then thought the approaching car was on his side of the highway and began to turn his truck to

his right when the collision occurred; that his truck was on his side of the highway with his right wheels at least two feet from the center stripe at the time of the collision; that two wheels of the approaching car were at least one foot over the center stripe of the highway on his side thereof at the time he began to turn his truck to the right, only a few seconds before the collision and before he had time to move more than a few feet further; and that his truck had been continuously on his side of the highway. He further testified that he was injured as a result of the collision and was temporarily unconscious but he soon got out of his truck cab, looked around and was taken immediately to the hospital where he remained several days. He could not remember much about what he saw immediately after the collision. He declined to estimate the speed of the approaching car other than to say it was running at a high rate of speed. He did not remember telling the Patrolmen that he pulled up onto his left lane of the highway or up into the center of the highway after he saw the approaching car but he did remember telling them he was continuously on his side of the highway. He could not explain why the dual tracks showed his vehicle being on the wrong side of the highway for a distance of 40 feet just prior to the collision unless it was because the trailer bounced over there as a result of the impact. He likewise testified that he left Dumas, Texas, the morning before the collision, delivered a load of gasoline and diesel to Las Vegas, New Mexico, and was returning for further duties when the collision occurred. Since he left Dumas on the morning before, he had slept only an hour or an hour and a half. Stallings' testimony given in person supports that given by the other witnesses except for his contention that his truck never did cross the center line of the highway and his testimony in that respect is contrary to the physical facts found on the grounds by the other witnesses.

■ Appellants contend that the evidence did not raise the issue of imminent peril and that the jury did not make fact findings sufficient to exonerate Chester Dye from the consequences of his own alleged negligence on any theory of imminent peril. They urge, in effect, that it should be held as a matter of law that the issue of imminent peril has not been raised by appellees, but, if raised, Chester Dye has not been excused of his own negligence. And they further contend that, if the issue of imminent peril has been raised, the findings, as a matter of law, do not support such issue. We know of no rule of law which would prohibit the application of the doctrine of emergency or sudden peril and alarm by reason of the fact that all of the parties travelling in the demolished motor vehicle were killed and cannot therefore testify. It has been held that under such circumstances "The question must be approached from the viewpoint of the deceased. His lips are closed and we do not have the benefit of his version of the occurrence". Boaz v. White's Auto Stores, 141 Tex. 366, 172 S.W.2d 481, 483, and other authorities there cited. The court there further held that it would be the presumption that the deceased exercised ordinary care for his own safety, as well as those with him, and before any adversary would be entitled to have it ruled otherwise as a matter of law, the burden rested upon such adversary to overcome that presumption by competent evidence so conclusively that reasonable minds could not differ with respect thereto. It must therefore be presumed that Chester Dye exercised ordinary care unless the presumption is overcome by competent evidence.

■ Upon the question of submitting and answering affirmative issues on imminent peril or sudden peril and alarm, conclusions may be inferred from facts proven. The uncontroverted facts reveal that the truck operator was driving 30 or 40 miles per hour around a curve of approximately 30° and upon a slight slope toward the crest of a hill over the top of which the truck operator could not see. Suddenly a car "topped the hill" coming rapidly toward him and only a short distance away. The truck operator saw the reflection of the lights immediately before the car "topped the hill" but he could not tell what posi-

tion the car occupied on the highway until it reached the crest of the hill. Such being true with reference to the position and point of view of the truck operator, certainly the same thing was true of the operator of the approaching car. Chester Dye may have seen the reflection of the truck lights before reaching the crest of the hill. But he could not have seen the truck or its lights any sooner than the truck operator saw the car and its lights. Because of the curve in the highway the two vehicles apparently did not face each other directly until immediately before the collision, if at all, and therefore their lights did not shine directly upon each other until they faced each other. The physical facts, and particularly the skid marks and tracks of the two vehicles, show the truck was travelling around the curve, up a slight slope and on his wrong side of the highway, while the approaching automobile was travelling on the operator's own side of the highway, down a slight slope, until he got within 10 or 12 feet of the point of impact when his left wheels crossed over the center stripe at about which time the truck pulled to the right when the collision occurred in the center of the highway. In view of the admitted facts testified to by Stallings, together with other evidence, particularly the physical facts found at the scene of the collision immediately after it occurred, it would be easy for reasonable minds to conclude and find that the truck operator had been for a long time on duty without sufficient sleep and rest and at the hours shown early in the morning drowsily drifted with his truck over the center line of the highway onto the wrong side thereof at a speed of 30 or 40 miles per hour as he was making a curve to then suddenly observe an approaching car "topping the hill" on its own side of the highway probably less and certainly not more than 200 feet away, keeping in mind that the collision occurred only 100 feet north of the top of the hill; that because of the position of the approaching truck, Chester Dye, operator of the approaching car, was placed in a position of sudden peril and alarm without any fault of his own; that such reasonably so appeared to Chester Dye, who, because of apparent danger, had no time for deliberation and therefore was justified in becoming startled, dazed and confused to such an extent that he was justified further in trying to extricate himself or avoid a collision by suddenly turning to his left and even across the center line of the highway to his left. For these reasons, it is our opinion that the testimony generally, strongly supported by the physical facts, justify the submission by the trial court of the issues of sudden peril and alarm or imminent peril, as well as the answers of the jury thereto, which, in effect, made the negligence of the truck operator wholly responsible for the collision that resulted in the deaths and damages. Beck v. Browning, 129 Tex. 7, 101 S.W.2d 545; International & G. N. R. Co. v. Neff, 87 Tex. 303, 28 S.W. 283; Foster v. Woodward, Tex.Civ.App., 134 S.W.2d 417, writ refused; Hicks v. Frost, Tex.Civ.App., 195 S.W.2d 606, writ refused, n. r. e. These cases hold, especially the last two cited, that a person who suddenly finds himself in a situation of peril or apparent peril by reason of the negligence of another, and under stress or compulsion of fear or panic reasonably engendered by such negligence, acts so that he suffers injury, such action does not constitute negligence. Therefore, under the record here presented, the act of Chester Dye in crossing over the center line of the highway with the left part of his car at a point only 10 or 12 feet from the point of impact was justified and did not constitute negligence. The trial court was justified in so finding, under the existing circumstances and the record presented, at the request of either party, since no request for a finding on such an issue was made by either party and no objection to the omission of such was made by either party. Rule 279, Texas Rules of Civil Procedure; Brown v. Tieman, Tex.Civ.App., 239 S.W.2d 156; Dakan v. Humphreys, Tex.Civ.App., 190 S.W.2d 371.

Appellants contend that Chester Dye was guilty of negligence per se in that he violated the provisions of Article 801(a) of the Penal Code by driving his vehicle on the wrong side of the highway. However, the record reveals that Chester Dye

was justified in crossing over the center line as he did. Such being true he did not violate the law. Killen v. Stanford, Tex. Civ.App., 170 S.W.2d 792; McClelland v. Mounger, Tex.Civ.App., 107 S.W.2d 901; Hicks v. Morgan, Tex.Civ.App., 259 S.W. 263; White v. Beaumont Implement Co., Tex.Civ.App., 21 S.W.2d 559; Phoenix Refining Co. v. Powell, Tex.Civ.App., 251 S.W.2d 892. Appellants likewise failed to plead any such violation of the law, which failure alone defeats their claim of right to rely upon a plea of negligence per se. Belzung v. Owl Taxi, Tex.Civ.App., 70 S.W.2d 288; Mercer v. Evans, Tex.Civ. App., 173 S.W.2d 206; Wright v. McCoy, Tex.Civ.App., 110 S.W.2d 223. Since the acts of Chester Dye do not constitute negligence it logically follows that such acts were not therefore a proximate cause of the collision.

Under the record here presented the trial court was likewise justified in sustaining appellees' motion to set aside and disregard the jury findings to issues presented in special issue number 12 wherein the jury found that Chester Dye failed to keep a proper lookout such as an ordinary prudent person would have kept under the same or similar circumstances and that such was a proximate cause of the collision for the reason that neither answer had any support in the evidence. If issues have no support in the evidence, such a motion is authorized by Rule 301 of Texas Rules of Civil Procedure. According to the evidence presented, as such has been previously herein stated and discussed by us as it may have any bearing on the questions here presented, there was not a scintilla of evidence, either direct or circumstantial, tending to support the jury's findings to the effect that Chester Dye failed to keep a proper lookout and that such was a proximate cause of the collision. In support of their contentions to the contrary appellants have failed to point out any evidence in particular in support of their contention, other than to refer us to the evidence generally. They seem to rely principally on the fact that Chester Dye crossed over the center line of the highway immediately before the collision and they assume that such was done at a time when the truck was on its proper side of the highway, which assumption is contrary to the existing physical facts. The issue of Stallings being found on the wrong side of the highway has already been foreclosed against appellants anyway for reasons previously stated. Under the record here presented, Chester Dye was justified in partly crossing over the center line of the highway as he did and such has already been so determined. Under the authorities previously cited it must be presumed that Chester Dye exercised ordinary care until appellants have discharged the burden of overcoming that presumption by competent evidence so conclusively that reasonable minds could not differ with respect thereto. Boaz v. White's Auto Stores, supra. We also cite the case of Merritt v. Phoenix Refining Co., Tex. Civ.App., 103 S.W.2d 415. In the case at bar there is no evidence from Stallings or otherwise tending to show that Chester Dye was not keeping a proper lookout. Appellants have therefore failed to discharge that burden with which they were charged. On the contrary the evidence tends to show that Chester Dye was on his own side of the highway until he was within 10 or 12 feet of the point of impact; that he was then justified in crossing over the center line; and that he was therefore presumed to be keeping a proper lookout. As held by us in the Freeman venue action, it clearly appears from the physical facts that an operator of a motor vehicle driving around a curve in the highway and over the center line thereof while meeting a closely approaching vehicle, as the evidence reveals Stallings was doing, was failing to keep a proper lookout. But it cannot be assumed that a driver of a motor vehicle is failing to keep a proper lookout unless there is some evidence of some nature, some circumstance or physical fact to show or tend to show that he was not keeping a proper lookout. In this instance there was none and we think the trial court was therefore justified in sustaining the motion of appellees in question.

However, assuming that Chester Dye may not have been keeping a proper lookout, such could not have been a proximate cause of the collision when his proce-

dure was obstructed by a closely approaching truck on his side of the highway which truck suddenly turned back to its right when Dye tried to avoid it by turning to his left. Without establishing proximate cause, if negligence existed, appellants could not defeat recovery by reason of such existing negligence. Dallas Ry. Co. v. Eaton, Tex. Civ.App., 222 S.W. 318; Dallas Railway & Terminal Co. v. Walsh, Tex.Civ.App., 156 S.W.2d 320, affirmed 140 Tex. 385, 167 S.W.2d 1018; Thompson v. Gray, Tex.Civ. App., 219 S.W.2d 831; Gulf, C. & S. F. Ry. Co. v. Russell, 125 Tex. 443, 82 S.W.2d 948.

■ Appellants seek to invoke the doctrine of joint enterprise as well as the doctrine of imputed negligence between parent and child and between husband and wife but we do not find either doctrine applicable in this case. They likewise seek by a cross-action contribution to the extent of half of the recovery awarded Mrs. Fern Dye by reason of the death of her daughter, Rogene, but we find no basis for such a claim.

■ Appellants charge that the awards of $7,187.50 and $5,000, respectively, to the respective parents, for the pecuniary benefits which would with reasonable probability have been received after reaching their majority from Chester Dye and Rogene Jones, respectively, had they lived, were each without support in the record and were each excessive. Such would depend to some extent upon the life expectancy of each parent and each child. J. C. Dye was 44 years of age on the date of the collision with a life expectancy of 25.27 years; his son, Chester, was 17 with a life expectancy of 44.19 years; Mrs. Fern Dye was 36 with a life expectancy of 31.07 years; her daughter, Rogene, was 15 with a life expectancy of 45.50 years. In the case of McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, it was held that future earnings are always uncertain and must be left largely to the sound judgment and discretion of the jury. No general rule can be established other than each case must be judged upon its own peculiar facts and the damages proved with that degree of certainty with which the case is susceptible. The verdict must be based upon such facts as are available and upon something more than conjecture. The evidence reveals that Chester and Rogene were both obedient, loyal, faithful, industrious children both at home and at school where they were both good students. Rogene was a sophomore in high school, while Chester would have graduated from high school the following spring but liked farm life and farm work and did not plan to go to college. Previously his father owned a farm where Chester worked much of the time when not in school. The farm was sold and Chester expressed regret but worked for an uncle and others for wages until his father had recently purchased another farm of 1095 acres with most of it in cultivation. By agreement with his father Chester planned to take charge of the farm the following spring and operate it indefinitely with them sharing the profits. He planned to work on the farm prior to spring when not in school. His experience, interest and ability as a farm worker already exceeded that of the average lad of his age. These qualities, together with his other good traits, would doubtless have preserved and protected his father's interests, to say nothing of the profits, more and better than an average tenant farmer would have. But farm labor was $10 per day if he were hired by his father who would, in that event, presumably received all of the profits from the farm. In either event jurors in such cases are permitted to exercise their own discretion, based upon their own experience and common knowledge in arriving at such future earnings. It has been held in such a case that "The jury is generally justified in finding the pecuniary damages at a higher figure than that which merely includes proven wages." J. Weingarten v. Sanchez, Tex. Civ.App., 228 S.W.2d 303, 310. In that case the sum of $15,208 was awarded by a jury to a 46 year old mother and a 55 year old father with life expectancies of 23 and 16 years, respectively, for the death of their 14 year old son. Back in 1921 the sum of $12,562 was awarded to a mother for the death of a 17 year old son as pecuniary benefits after he became 21 years of age.

Hines v. Richardson, Tex.Civ.App., 232 S.W. 889. Since then the value of the dollar has decreased while the cost of living, farm labor and domestic services have increased. These matters may be considered in arriving at future services and pecuniary benefits. Younger Bros. v. Marino, Tex.Civ.App., 198 S.W.2d 109; Dallas Railway & Terminal Co. v. Bishop, Tex.Civ. App., 203 S.W.2d 651.

The same rules of law and reasoning will apply just as well to the loss of the pecuniary benefits of Rogene Jones, the value of which was fixed at $5,000 or $2,187.50 less than that fixed in the case of Chester Dye. According to the evidence Rogene possessed the same good qualities Chester did and was probably more interested than Chester in Sunday School and Church activities. She was very considerate of and good to her mother, helped with all the home responsibilities. She prepared meals, washed dishes, made beds, ran errands, helped generally and for a time worked on the side in a local drug store at a wage rate of 40¢ per hour. The prospects of Rogene's loyal, faithful, obedient, industrious help to her mother for a life expectancy period of 31 years would have meant much to her mother in the way of pecuniary benefits, just as the prospects of such by Chester Dye would have meant much to his father during his life expectancy of 25 years.

 We are not privileged to inquire into the functions of the minds of the jury or the processes of reasoning exercised by the members of the jury panel in arriving at the sums fixed by them. At prevailing prices the sums the jury fixed would not amount to very much per year over a period of years. The verdict of the jury was for the total sum of $24,009.50 while appellees sued for the total sum of $128,320, thus showing an award made of less than 1/5 of the amount sought. The record does not reflect any bias or prejudice on the part of the jury. On the contrary it appears that the jury endeavored to be fair and just according to the existing facts and circumstances presented. In our opinion the sums awarded, about which appellants here complain, had sufficient support in the evidence and were not excessive.

Appellants have likewise challenged the court's charge and claim it was both a general charge and upon the weight of the evidence, particularly that part given on the elements or measure of damages with reference to pecuniary benefits of the children after attaining their majority. Without further prolonging this opinion, suffice it to say we believe that part of the charge about which appellants complain seems to have met the approved rule set forth in the case of Dallas Ry. & Terminal Co. v. Ector, 131 Tex. 505, 116 S.W.2d 683, and other authorities there cited. In support of the rule mentioned we likewise cite the case of City of San Antonio v. Fike, Tex.Civ.App., 224 S.W. 911; 33 Tex.Jur. 270, Sec. 168, and also 41–B, Tex.Jur. 718, Sec. 534, together with the many authorities cited by the texts. We find no fault with the trial court's charge and therefore overrule the challenge.

A careful examination of the record and the briefs reveals no reversible error. Appellants' points to the contrary are therefore overruled and the judgment of the trial court is affirmed.